# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:05 CR 48 |
| | ) | |
| MARIO ARITA-CAMPOS | ) | |

## OPINION AND ORDER

Mario Arita-Campos was found to be in this country illegally in 1993, and was released by immigration and allowed to stay in the United States pending a deportation hearing. A deportation hearing was in fact held in Los Angeles in early 1994, but Arita-Campos was a no show. So he was ordered deported *in abstentia*. Whether he received notice of that hearing is the nub of it. Arita-Campos was in the wind until 2004 when the immigration authorities finally caught up with him in Illinois and sent him packing based on the 1994 order of deportation. Like a boomerang, Arita-Campos came back to the United States where he was found in this district a handful of months later. He is now charged with illegal reentry after deportation pursuant to 8 U.S.C. § 1326(a). His present motion to dismiss the indictment by challenging the propriety of the initial *in abstentia* hearing is denied because he has not shown that the hearing was fundamentally unfair or that he exhausted all of his administrative remedies.

## BACKGROUND

Arita-Campos, from Honduras, entered the United States illegally in September 1993, when he was fourteen years old. Order to Show Cause [DE 52-2] at 13. He does not dispute that on October 5, 1993, he was personally served with an Order to Show Cause informing him of the allegations supporting the charge of deportation and that he was ordered to appear before an Immigration Judge. *Id* at 13, 15. It did not provide a specific date for the upcoming deportation

hearing, but informed Arita-Santos that it would be calendared and notice would be provided to him in the future. *Id*. at 15. So there is no question that Arita-Campos knew he was in hot water with the U.S. immigration authorities. The notice also told him he was required to provide an address where he could be contacted and to notify the Immigration Judge's office of any changes to that address. *Id*. at 16. Arita-Santos gave the address of his brother at 1204 Plymouth, Los Angeles, California. *Id*. at 13. The Order was written in both English and Spanish and was read to him aloud in Spanish by an INS officer. *Id*. at 17.

On February 10, 1994, an Immigration Judge conducted a deportation hearing for Arita-Campos. Decision of the Immigration Judge [DE 52-2] at 2-4. Arita-Campos never showed up for the hearing so it was held *in abstentia*. *Id*. The parties now dispute whether Arita-Campos ever received notice of the hearing. The Immigration Judge, based upon a review of documents provided by the Government, including an I-213 form, found that the government established Arita-Campos's deportability based on clear, convincing and unequivocal evidence, and ordered him deported to Honduras. *Id*. He also found that Arita-Campos was provided proper notice of the hearing by certified mail. *Id*. at 2; Hearing Transcript [DE 50-2] at 4. So on August 26, 1994, a Warrant of Deportation was issued against Arita-Campos. 1994 Warrant [DE 20-7]. On the same day, an I-166 form was sent to his brother's address informing him of the details of his departure details, scheduled for September 28, 1994.

Arita-Campos did not show up at the immigration office for his scheduled departure and was not heard from again until May 3, 2004, when he was arrested in Illinois on the original 1994 order of deportation. Record of Deportable Alien [DE 20-9] at 1-2. A Warrant of Deportation dated on June 10, 2004 shows his deportation out of Houston, Texas, witnessed by

an Immigration Enforcement Agency officer. 2004 Warrant [DE 20-10]. Less than a year later, in 2005, Arita-Campos was found in this country again, this time evidently somewhere in the Northern District of Indiana. He was then indicted by a grand jury in this district and charged (apparently mistakenly) with illegal reentry after conviction for an aggravated felony. *See* 8 U.S.C. § 1326(b)(2). [DE 1].

For reasons that are not entirely clear, Arita-Campos was not in custody at the time of his indictment in this district so he didn't make an initial appearance in this case until three years later when he was arrested in Connecticut. *See* June 12, 2008 Connecticut Minute Entry [DE 3] at 5. A magistrate judge in Connecticut ordered him detained and returned to the Northern District of Indiana. A superceding indictment was filed on October 15, 2008, modifying the charge to illegal reentry under § 1326(a), doing away with the prior felony allegation. [DE 34].

Arita-Santos moves to dismiss the indictment, collaterally attacking his *in absentia* order of deportation based on improper notice. *See* 8 U.S.C. 1326(d). Simultaneously, the Government filed a motion *in limine* to prevent Arita-Santos from litigating the original deportation proceeding. Those are the motions presently before the court.

## DISCUSSION

§ 1326(a) makes it a crime to enter the United States without the consent of the Attorney General after having been previously denied admission, excluded, deported, or removed. In *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987), the Supreme Court concluded that defendants must be permitted the chance for collateral attack against the underlying deportation order when the original proceeding was "fundamentally unfair" and "when the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." This avenue

for collateral attack was codified in 1996, with an additional requirement tacked on for exhaustion of remedies. § 1326(d) now reads:

> In a criminal proceeding under this section, an alien may not challenge the validity of [a prior deportation order] unless the alien demonstrates that-
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

The parties' dispute focuses on the third prong 1326(d), which requires a defendant to demonstrate that the initial deportation order was "fundamentally unfair." This, in turn, requires Arita-Campos to show both that there was a violation of due process, and that he was prejudiced by the deportation proceedings. *United States v. Santiago-Ochoa,* 447 F.3d 1015, 1019-20 (7th Cir. 2006). With respect to a Notice of Hearing, due process demands only proof of attempted delivery through certified mail, not actual receipt. *See Joshi v. Ashcroft*, 389 F.3d 732, 736 (7th Cir. 2004), *Adeyemo v. Ashcroft*, 383 F.3d 558, 560 (7th Cir. 2004)(citing *Matter of Grijalva*, 21 I. N. Dec. 27, 33 (BIA 1995). An Order to Show Cause, in contrast, "must be signed by the respondent or a responsible person at the respondent's address and returned to effect personal service." *Adeyemo,* 383 F.3d at 560 (quoting *Matter of Huete*, 20 I. & N. Dec. 250, 253 (BIA 1991). In addition, a "strong presumption" of effective service exists when performed through certified mail. *Santana Gonzalez v. Attorney General*, 506 F.3d 274, 278 (3rd Cir. 2007)(citing *Grijalva*, 21 I & N Dec. at 37). The evidence needed to overcome this presumption must be "substantial and probative . . . such as documentary evidence from the Postal Service, third party affidavits, or other similar evidence demonstrating that there was improper delivery or that

4

nondelivery was not due to the respondent's failure to provide an address where he could not receive mail." *Hua Guo Peng v. Mukasey*, 292 Fed. Appx. 88, 89 (2nd Cir. 2008)(quoting *Grijalva*, 21 I & N Dec. at 37).

The question here is not whether the government is responsible to conclusively prove (some 15 years after the fact) that proper delivery was attempted, a proposition for which Defendant cites to *Adeyemo*, 383 F.3d at 560. The question is instead whether the defendant can show that the initial hearing was fundamentally unfair by failing to provide for due process. *See* § 1326(d)(3). When the Seventh Circuit said in *Adeyemo* that the government must establish proper notice with "clear, unequivocal, and convincing evidence" it was speaking of the government's burden at the initial deportation hearing, not it's burden when defending against challenges asserted later. *Adeyemo*, 383 F.3d at 561.[1] In addition, the contested notice in *Adeyemo* was an Order to Show Cause, the requirements for which the opinion itself stated were more stringent than for a Notice of Hearing. *Id*. at 559 ("The case hinges on the distinction between Orders to Show Cause and Notices of Hearing.").

With this threshold in mind, Arita-Campos must bring clearer proof of procedural impropriety before I can overturn the Immigration Judge's decision from 15 years ago. There is nothing in either the Immigration Judge's order of deportation or hearing transcript that reveals a failure to assess whether the immigration service had properly attempted delivery. First, the Immigration Judge specifically stated at the hearing that the notice was performed through certified mail and was proper. Hearing Transcript [DE 50-2] at 4. He later formalized this

---

[1]Actually, *Adeyemo* was not speaking of § 1326 illegal reentry at all; the case was before the Seventh Circuit was a § 1229a(b)(5)(C) motion to reopen. 383 F.3d at 560.

finding in his written opinion, noting that "[t]he respondent was duly notified of the time and place of the hearing, but without reasonable cause failed to appear on February 10, 1994." Decision of the Immigration Judge [DE 52-2] at 2. Moreover, the Immigration Judge stated directly that he reviewed the "Certified written Notices provided to [Arita Campos's] last known address." Hearing Transcript [DE 50-2] at 3.

It is true that the Notice of Hearing does not appear in the record surviving from that long ago proceeding. But the Immigration Judge indicated that he was designating documents "1-B through 10-B" as exhibits relevant to the Notice of Hearing, and there are only a few documents in the current record marked in that range. *See* Hearing Transcript [DE 50-2] at 3; Executive Office for Immigration Review (EOIR) Record [DE 52-2]. The Immigration Judge was plainly looking at more than the few scattered documents that currently exist, and the transcript shows he used those documents to determine if delivery of the Notice of Hearing was attempted. The absence of the Notice of Hearing does not, by itself, warrant the reversal of the Immigration Judge, especially when the transcript and written opinion state unequivocally that they existed at the time of the hearing and that the immigration judge reviewed them.

This is an even stronger case than *United States v. Arevalo-Tavares*, 210 F.3d 1198, 1200 (10th Cir. 2000) where the Tenth Circuit held that, even where a transcript of an earlier deportation hearing was completely unavailable, the "presumption of regularity" afforded to that hearing is not destroyed when assessing the merits of a § 1326(d) challenge. The Supreme Court came to a similar conclusion in *Parke v. Raley*, 506 U.S. 20, 29 (1992) where it refused to suspend the presumption of regularity in a defendant's collateral attack of his prior convictions, despite the fact that the transcript and other records from his earlier plea colloquies were

missing. *Id*. at 29-30. The Court noted that collateral attacks in general must overcome the "presumption of regularity" that is "deeply rooted in our jurisprudence." It would be an odd result to find that the presumption of regularity is rebutted in this case where we actually have a transcript from a 15 year old immigration proceeding where the judge found on the record that notice was given, yet apply the presumption in cases like *Arevalo-Tavares* and *Parke* where there is no transcript at all.

There isn't just the transcript of the immigration hearing to rely on in this case to prove that service of the notice of hearing was attempted. There is also a receipt for certified mail addressed to the defendant at his brother's address in Los Angeles containing a January 3, 1994 date stamp – the very address Arita-Campos gave to the authorities when he was first stopped. Receipt [DE 52-2]. This document was found in the Executive Office for Immigration Review ("EOIR") file. Recall that January 3,1994 was roughly six weeks before the hearing (February 10, 1994). So in all likelihood this was the attempt by the immigration authorities to serve notice of the hearing on Arita-Campos. As stated, the receipt shows the proper address for Arita-Campos's brother and a name signed under the "Agent" box. Arita-Campos stresses that there is only a blank left in the space marked for the signature of the "Addressee." But since, as explained earlier, the immigration service was only required to show attempted delivery at Arita-Campos's *in absentia* hearing, and not actual receipt as in the case for an Order to Show Cause, this document actually evidences that the procedural guidelines were correctly followed.

Arita-Campos also flags a copy of a return-envelope in the file marked "Return to Sender" and dated February 14, 1994. Envelope [DE 52-2]. He suggests this was the envelope containing the Notice of Hearing, and since it was returned on February 14, 1994, the

Immigration Judge could not have made a correct assessment as to notice at the February 10 hearing four days earlier. But this is far-fetched. What is altogether more likely is that the envelope contained the copy of the Immigration Judge's February 10 decision, in an attempt to inform Arita-Campos that he had been ordered deported.

Arita Campos's challenge fails for similar reasons as the defendant's in *United States v. Villavicencio-Garcia*, 2006 WL 3025628, at * 4-5 (W.D. Wis. Sept. 22, 2006), who claimed that he did not receive proper notice of hearing and could prove it because the initials on the notice's certification were illegible. The Immigration Judge had found at the *in absentia* hearing that the notice was properly given to the parties. *Id*. at * 3. When later challenged through § 1326(d), the district court reasoned that the minor technicalities brought to the forefront years after the initial hearing did not overcome a reliance on the Immigration Judge's notice analysis. Although recognizing that the Immigration Judge may have used boilerplate language when approving of the proof of notice, this was not cause to question the accuracy of his findings. *Id*. "The Immigration Judge presiding over defendant's removal hearing, who was familiar with the INS's personnel and procedures, was satisfied with the adequacy of the certification." *Id*. at * 5. In the same vein, I find that Arita-Campos has not brought a legitimate reason to doubt the findings of the Immigration Judge who ordered his 1994 deportation.

Arita-Campos relies heavily on *United States v. El Shami*, 434 F.3d 659 (4th Cir. 2005), but in that case the government stipulated that there was "no evidence in El Shami's immigration file to reflect that the INS had sent El Shami written notice of the final deportation hearing." In contrast, Arita-Campos's file contains a certified receipt, as well as the Immigration Judge's findings of proper notice after his discussion and review of other documents in support of that

8

determination.

In sum, even placing his burden of proof as low as a preponderance of evidence standard, *see e.g., United States v. Martinez-Amaya*, 67 F.3d 678, 682 (8th Cir. 1995), there is nothing to show that the Immigration Judge failed in 1994 to properly analyze the merits of the Immigration Service's proof of notice. In fact, most of the evidence – including the transcript of the hearing and the certified return receipt sent to Arita-Campos' proper address – points to the conclusion that service of the notice was at least attempted. So Arita-Campos has failed to demonstrate that his initial deportation proceeding was fundamentally unfair under § 1326(d).

Beyond the question of notice, Arita-Campos also claims a procedural deficiency in the Immigration Judge's use of the assertions contained in the I-213 form. Arita-Campos argues this was improper because the statements in the I-213 "likely" came from the defendant, who was a minor at the time. She cites to *In re Efrain Amaya-Castro*, 21 I. & N. Dec. 583, 586 (BIA 1996), for the proposition that Immigration Judges may not accept the admissions of deportability from unrepresented minors. But the same case goes on to explain that while charges of deportability may be accepted from unrepresented and unaccompanied minors, the Immigration Judge may accept admissions to *factual allegations. Id*. "8 C.F.R. § 242.16(b) does not preclude an Immigration Judge from accepting such a minor's admissions to factual allegations. Minors under the age of 16, even when unaccompanied and unrepresented, are not presumed incapable of understanding the content of those allegations and of determining whether they are true." *Efrain Amaya-Castro*, 21 I. & N. Dec. at 586. *Efrain* also states that the rule applies to a minor who is not represented *and is not accompanied* by a guardian, relative or friend. *Id*. The I-213 form entered into evidence at the Arita-Campos hearing does not contain any admissions of

9

deportability. I-213 Form [DE 52-2] at 9. Instead, the main narrative paragraph simply reads:

> Subject entered as stated above without being inspected by an immigration inspector and with no immigration documents of any kind. Subject was traveling with his older brother Jorge Luis. They were traveling first to Houston and then on to Los Angeles Calif.

Although Arita-Campos characterizes the I-213 information as having "likely" come from his own admissions, it is not possible to determine whether the narrative was based on admissions or as a result of independent law enforcement investigation.[2] Either way, they are factual allegations and not admissions to deportability and so could be relied on by the Immigration Judge. In addition, the words "Acompanied [sic] Minor" are written on the top of the form, leading to the inevitable conclusion that Arita-Campos was with someone when interviewed by the investigators filling out the I-213 form, and so the rule precluding reliance on admissions from minors would not apply to him.

Even if Arita-Campos had proven a violation of due process, he would have failed to meet all the elements of § 1326(d) because to show fundamental unfairness he must also show that he was prejudiced by the removal proceedings. *See United States v. De Horta Garcia*, 519 F.3d 658, 661 (7th Cir. 2008). In this context, prejudiced means that judicial review "would have yielded him relief from deportation." *Id*. (citing *United States v. Espinoza-Farlo*, 34 F.3d 469, 471 (7th Cir. 1994). He argues that with proper notice he could have challenged the factual legal basis for his deportation, presented his own evidence and argument, and appealed to the BIA and the Court of Appeals. The problem is, Arita-Campos doesn't say what that evidence was and what the arguments might have been to counter the basis of his deportation, and so I

---

[2]The I-213 Immigration form contains "biographical information about a noncitizen as well as information obtained through undercover investigations, other law enforcement agencies, the USCIS, U.S. Customs and Border Protection (CBP), and other agencies." ANNE MARIE GALLAGHER & MARIA BALDINI-POTERMIN, IMMIGRATION TRIAL HANDBOOK § 7:11 (2008).

cannot say they would have yielded him relief.

Trying another tactic, he maintains he was prejudiced because, by missing out on the *in absentia* hearing, he was denied the opportunity to seek voluntary departure. The law making voluntary departure available to him at the time allowed an alien to depart voluntarily "in lieu of deportation" if he established to the satisfaction of the Attorney General that he was "a person of good moral character for at least five years immediately preceding his application for voluntary departure." 8 § U.S.C. 1254(e) (1994) (current version at 8 U.S.C. § 1229c). Arita-Campos has provided no evidence showing his good moral character, and so I cannot say that a cure of the notice defects he alleges "would have yielded him" an avenue for voluntary departure and relief from deportation. In addition, the Order to Show Cause, which he does not dispute he received, discusses the option of voluntary departure. *See* Order to Show Cause [DE 52-2] at 16. Thus, any prejudice he suffered by not being told orally about the voluntary departure option at a hearing was minimal at best, as he could have applied for voluntary departure on his own.

More to the point, Arita-Campos has provided no caselaw (and I have found none), which finds that the prejudice of not being told about the voluntary departure option is, in and of itself, enough to support a § 1326 collateral attack. *C.f. See United States v. Hinojosa-Perez*, 206 F.3d 832, 834, 837 (9th Cir. 2000)(finding defendant's *in absentia* hearing was not fundamentally unfair despite fact that it appeared he could have asserted a legitimate claim for voluntary departure). This makes perfect sense; for to hold otherwise would enable every single defendant who is ordered removed *in absentia* to claim prejudice, since none of them are given the voluntary departure option by an Immigration Judge in a face-to-face setting. To top it off, the Seventh Circuit has held that there is no constitutional right to be informed of, or be

11

considered for, discretionary relief. *Santiago-Ochoa*, 447 F.3d at 1020; *Roque-Espinoza*, 338 F.3d at 730 ("[I]t would be hard to show that the loss of a chance at wholly discretionary relief from removal is the kind of deprivation of liberty or property that the due process clause is designed to protect."); *see also*, *Dada v. Mukasey*, 128 S.Ct. 2307, 2310 (2008)(defining voluntary departure as a form of discretionary relief).

All told, Arita-Campos cannot show prejudice in anywhere near the way that, for example, the defendant could in *El Shami*. There, the Fourth Circuit found a "reasonable probability that [El Shami] would not have been deported" because his status as permanent resident before deportation, as well as several mitigating factors in his favor such as his American citizen wife and child, made him a likely candidate for waiver relief under 8 U.S.C. § 1182(c) (1994). Arita-Santos was never a lawfully admitted permanent resident and so the avenue of relief provided under § 1182(c) was never available to him. Nor has he shown any other form of relief that was likely available to him but taken away because of the missed opportunity to participate in his deportation hearing.

I also find that Arita-Campos did not exhaust all of his administrative remedies. § 1326(d)(1). Because the three prongs of § 1326(d) are stated in the conjunctive, two circuits have held that a defendant must demonstrate exhaustion to prevail on his collateral attack. *United States v. Wilson*, 316 F.3d 506, 509 (4th Cir. 2003); *United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2d. Cir. 2002). The Ninth Circuit has hedged slightly in the context of rights to appeal. *United States v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001) ("The exhaustion requirement . . . cannot bar collateral review of a deportation proceeding when the waiver of a right to an administrative appeal did not comport with due process."). The Seventh Circuit has

recognized the Circuits' differences and not formally taken sides, though on at least two occasions has applied the exhaustion requirement to defendants hoping to make use of § 1326(d). *See Roque-Espinoza*, 338 F.3d at 728; *Santiago-Ochoa*, 447 F.3d at 1019. Given these examples, along with the fact that, as will be explained shortly, a failure to receive notice would not have deprived Arita-Campos of the information needed to pursue alternative relief, I must apply the exhaustion requirement to his § 1326(d) challenge.

Arita-Campos could have filed a motion to reopen the deportation proceedings, pursuant to 8 U.S.C. § 1229a(b)(5)(C), the current rule, or 8 U.S.C. § 1252b(c)(3)(B), the identically phrased 1994 rule. Upon an alien's motion to reopen, which can be filed "at any time," a removal order will be rescinded if the alien can demonstrate he did not receive notice. § 1229a(b)(5)(C) (2008); § 1252b(c)(3)(B) (1994).[3] This rule seems crafted precisely to alleviate the predicament in which Arita-Campos found himself. Arita-Campos concedes that *Hinojosa* is an example of an opinion finding that a defendant's failure to file a motion to reopen meant that he had not met the exhaustion element of § 1326(d), but argues it is distinguishable. He maintains that he was never "advised" of the concept of reopening the *in absentia* deportation, and that this separates him from the defendant in *Hinojosa*. *See* Def.'s Reply [DE 50] at 15. That is simply not the case. In fact, the two defendants were advised in the exact same way - through their Orders to Show Cause. Both Orders were delivered in person and read aloud, in Spanish. *Compare Hinojosa*, 206 F.3d at 833 *with* Order to Show Cause [DE 52-2] at 17. Both Orders contained provisions explaining the aliens' rights to seek rescission of an *in absentia*

---

[3]The time to file a motion to reopen is limited to the period up until his or her departure from the United States. 8 C.F.R. § 1003.23(b)

deportation ruling in the event they failed to get a Notice of Hearing. *Compare Hinojosa*, 206

F.3d at 836, *with* Order to Show Cause [DE 52-2] at 16. This was actually the key element of

the Ninth Circuit's determination that Hinojosa failed to exhaust his administrative remedies,

and I see no reason why I should find otherwise for Arita-Campos. *Hinojosa*, 206 F.3d at 836.

In addition, the *Hinojosa* court found that the eight days in between the defendant's arrest

and deportation was a sufficient period for Hinojosa to challenge the *in absentia* order for lack of

proper notice. *Hinojosa,* 206 F.3d at 836. "All he had to do was to file a motion to reopen for the

purpose of challenging the validity of the order. The filing of the motion itself would have

automatically stayed his deportation pending resolution of his claim of defective notice." *Id*.; *see

also* § 1229a(b)(5)(C). Arita-Campos had not eight, but thirty-nine days between his May 3,

2004 arrest and June 10, 2004 deportation in which to move to reopen. *See* Record of

Deportable Alien [DE 20-9]; Warrant for Deportation [DE 20-10]. He did not do so and

therefore he failed to exhaust. *See also*, *United States v. Albert*, 2007 WL 1960628, at * 4 (E.D.

Wis. July 2, 2007) (finding that defendant failed to exhaust when he did not file a motion to

reopen his September 10, 1997 *in absentia* hearing at any time between November 20, 1997

apprehension and his January 7, 1998 removal).

In sum, Arita-Campos learned on October 5, 1993, from the Order to Show Cause, that

deportation proceedings were revving up against him. He then had from February 10, 1994,

when he was ordered deported, until May 3, 2004, the day he was arrested, to find out about his

*in absentia* order and seek to reopen it for lack of notice in the manner described on his Order to

Show Cause. The cry of ignorance can only carry him so far since, during this time, he proved

himself to be at least somewhat aware of his legal jeopardy and his ability to seek redress by

applying for Temporary Protected Status. *See* May 31, 2003 Application for TPS [DE 20-4]. But even giving him the benefit of the doubt that he was completely oblivious to his deportation order during that entire ten-plus year period, he still had more than a month after his arrest but before his deportation to seek a motion to reopen and invoke the stay provided by § 1229a(b)(5)(C).

## CONCLUSION

For the foregoing reasons, Defendant Arita-Campos's Motion to Dismiss the Indictment [DE 17] is **DENIED.** The Government's Motion in Limine [DE 16] is **GRANTED**, and Arita-Campos is precluded from challenging the validity of the original 1994 deportation order.

**SO ORDERED**.

ENTERED: February 6, 2009

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT